AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Northern District of New York

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Adebodun Idowu, d/o/b xx/xx/1963 | ) | Case No.  17-mj-435 |
| | ) | 1:        (CFH) |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ____Dec. 2015 - Sept. 26, 2017____ in the county of ____Rensselaer____ in the

____Northern____ District of ____New York____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1343 & 1349 | Count 1: Conspiracy to Commit Wire Fraud |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

HSI Special Agent Daria Botten
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ____09/26/2017____

_____
*Judge's signature*

City and state: ____Albany, New York____

Hon. Christian F. Hummel, U.S. Magistrate Judge
*Printed name and title*

**REQUEST FOR A CRIMINAL COMPLAINT**

41.)   Based upon my experience, training, and the totality of circumstances in the above information, there is probable cause to believe that between about December 2015 and about September 26, 2017, in the Northern District of New York and elsewhere, Adebodun Idowu and others known and unknown, did knowingly and intentionally combine and conspire to devise and execute a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and to cause the interstate transmission of writings, signs, signals, and sounds for the purpose of executing that scheme and artifice, in violation of Title 18, United States Code, Sections 1343 & 1349.

Daria Botten
Special Agent, HSI

Sworn and subscribed to before me
on this 26 day of September, 2017.

The Honorable Christian F. Hummel
United States Magistrate Judge
Northern District of New York

23

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

STATE OF NEW YORK          :
                                              ss.
COUNTY OF ALBANY          :

I, Daria Botten, being duly sworn, depose and say:

1.)    I am a U.S. Immigration and Customs Enforcement Homeland Security Investigations (HSI) Special Agent within the U.S. Department of Homeland Security and have been assigned to the Resident Agent in Charge, Albany, NY since October 2007.   As such, I am an investigative or law enforcement officer of the United States within the meaning of Title 18 United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516(1).

My career as a Special Agent began in June 2003 with the agency now known as U.S. Immigration and Customs Enforcement Homeland Security Investigations (HSI).  Additionally, I have been certified as a Computer Forensics Agent since March 2007 and have conducted numerous forensic exams on computers and digital media in support of investigations involving the online exploitation of minors and the possession and distribution of child pornography. As a HSI Special Agent, I am authorized to seek and execute federal arrest and search warrants for Title 18 criminal offenses, including violations of 18 U.S.C. §§ 1343 & 1349 (Conspiracy to Commit Wire Fraud).

1

2.)    In accordance with my present duties, I make this affidavit in support of a criminal complaint charging Adebodun Idowu with a violation of Title 18 U.S.C. §§ 1343 & 1349 [Conspiracy to Commit Wire Fraud].

3.)    I make this affidavit from a review of reports by other law enforcement agents, communication with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience.  The information outlined below is provided for the limited purpose of establishing probable cause and does not contain all details or all facts of which I am aware relating to this investigation.

**PROBABLE CAUSE**

**Overview of the Investigation**

4.)    The schemes and/or conspiracy being investigated involve multiple individuals scattered across the United States, Europe and West Africa.  The purpose of the schemes is to defraud victims out of money, and then to launder the stolen monies.  The schemes target victims who fall into two broad categories: (i) victims who are middle-aged females with online dating profiles; and (ii) victims who are elderly.

5.)    With respect to the group of victims who are primarily middle-aged females, the perpetrators of the schemes have created online dating personas and seek to build online dating relationships with their unsuspecting victims. Once a victim has formed a romantic bond with the online persona of a member of the fraud group, the fraud group member tells the victim that he is purportedly facing some type of emergent circumstance and is in dire need of money (*e.g.*,

2

the fraudster's family member needs urgent surgery and there is no health insurance, the fraudster's small business can't make this week's payroll and as a result a lucrative building project is going to be lost).  The victims, because of the emotional bond that they have formed with what someone they believe to be a legitimate paramour, are thus tricked into wiring tens of thousands of dollars to a multitude of different individuals, entities and bank accounts (some of which are located in the United States and some of which are located overseas).

6.)     With respect to the group of victims who are elderly, the perpetrators of the schemes contact their victims through the telephone or via the Internet and inform their victims that they are the beneficiary of some type of large sum of money overseas (*e.g.,* the fraudster claims that the victim was determined to be the last remaining survivor of a distant relative who recently died and left a vast overseas fortune in the purported decedent's estate).  The victims are further told that before they can receive their sum of money, they must first pay some type of foreign country tax or export fee, etc.   The victims, believing the fraudsters' claims to be true, are tricked into wiring tens of thousands of dollars to a multitude of different individuals, entities and bank accounts (some of which are located in the United States and some of which are located overseas) hoping to free up the purported money.

7.)     Upon information and belief, Adebodun Idowu's[1] role in the schemes or conspiracy under investigation is to open and maintain multiple bank

---

[1] Adebodun Idowu is a Nigerian national who is a lawful permanent resident of the United States.

accounts in the United States that are used to receive monies stolen from victims in the above-described schemes, and then to either wire or transfer the stolen monies to other bank accounts belonging to various fraud members, or to withdraw the stolen monies in cash for subsequent dissemination to members of the conspiracy.

**Genesis of the Investigation**

8.)    In late January 2016, the U.S. Attorney's Office in Albany, New York was contacted by a well-known local criminal defense attorney.  The defense attorney advised that he believed that his client, V.G., was the victim of an online financial fraud.  The defense attorney believed that V.G., beginning in early January 2016, had been duped into wiring thousands of dollars into various bank accounts connected to individuals who were claiming that the funds were to be used (i) to build a hospital in Michigan, and (ii) to release a large amount of currency that was sitting in London, England, awaiting transfer to V.G.

**Interview of Victim V.G.**

9.)    On January 29, 2016, USPIS Postal Inspector Brendan Donahue interviewed V.G.  V.G. is a middle-aged female who lives in the Northern District of New York and who has been recently widowed.  V.G. said that sometime in December 2015 she was contacted, via her Match.com profile, by a man claiming to be "Michael Morgan" ("Morgan").  V.G. agreed to communicate with "Morgan," and they communicated over the telephone, via text message, and through the exchange    of    e-mails    via    "Morgan"'s    e-mail    address michael.morgan209@yahoo.com.   Over the next couple of weeks "Morgan"

4

proclaimed that he owned a construction company, and that he was romantically interested in V.G. "Morgan" sent V.G. his purported age (48), home address (30 Wilshire Drive, Delmar, NY), work address (Buhl Building LLC, 535 Griswold Street, Detroit, Michigan), and pictures.

10.)   Subsequent investigation has established that while an individual named "Michael Morgan" does in fact live at 30 Wilshire Drive in Delmar, New York, that individual is in his sixties, does not have any connection to the e-mail address michael.morgan209@yahoo.com, does not have an online dating account, and has never heard of V.G.   Additionally, the Buhl Building LLC management company has been contacted and they have never heard of "Michael Morgan."   Finally, it has been determined that one of the pictures (of "Morgan"'s face) that "Morgan" sent to V.G. of his purported self is actually a picture of an actor/musician (who lives in New York City) who appeared in an online news article about the actor/musician.   That actor/musician has been interviewed and he has never heard of "Morgan" or V.G.

11.)   Over the next couple of weeks (in or around late December 2015 and early January 2016), V.G. exchanged telephone calls and e-mails (via the e-mail account michael.morgan209@yahoo.com) with "Michael Morgan."   In one e-mail sent on January 3, 2016 to V.G., "Morgan" wrote, "you are the perfect girlfriend, fiancé, friend, person, human being in the world.  you, my baby.  you're my life and you have my whole heart.  I adore you and every part of you., you are the key to my heart, my other half, my soul mate and I will be so happy the day that

I get to walk down the aisle and say, "I do…" 'cause, Baby, I DO!! I love you and don't ever forget that". To this date, V.G. has never met "Morgan" in person.

**"Morgan"'s Purportedly Distressed Construction Company**

12.) During the telephone conversations between V.G. and "Morgan" in or around late December 2015 and early January 2016, "Morgan" repeatedly expressed disappointment that his purported hospital construction project in Algonac, Michigan kept experiencing financial hardships, including an inability to make payroll. "Morgan" asked V.G. for financial assistance, and she agreed to help "Morgan" by wiring, at "Morgan"'s direction, multiple sums of money to various individuals and bank accounts located both inside and outside of the United States. "Morgan" claimed that he would pay V.G. back for the monies that she wired and sent V.G., via the e-mail account michael.morgan209@yahoo.com, pre-signed "Installment Notes" purporting to promise to pay back any loaned monies. To date, V.G. has not been repaid any monies by "Morgan" or his purported construction company.

**The Wires Sent by V.G.**

13.) Between January 4, 2016 and January 22, 2016, V.G., at "Morgan"'s direction, sent four separate wires[2] ($12,540.00, $30,040.00, $150,000.00, and $11,216.92) to four different bank accounts and/or beneficiaries (three of which were located in the United Kingdom and one of which was located in California).

---

[2] V.G. sent the wires from her bank account located in the Northern District of New York.

Thus, the total amount of the wires sent by V.G. to various individuals and/or entities at the request of "Morgan" is over $200,000.00.

### Identification of E-Mail Account evanskennedy22@yahoo.com

14.)   On February 3, 2016, the Honorable Christian F. Hummel, U.S. Magistrate Judge, N.D.N.Y., signed a search warrant authorizing investigators to search "Morgan"'s e-mail account michael.morgan209@yahoo.com.  Pursuant to the search of the aforementioned account, investigators seized a January 30, 2016 e-mail from evanskennedy22@yahoo.com to "Morgan."  The subject line of the e-mail was "Line." Investigators believed that evanskennedy22@yahoo.com was telling "Morgan" what to say to V.G.   The text of the e-mail between evanskennedy22@yahoo.com and michael.morgan209@yahoo.com is as follows:

> I am very unhappy at the moment, I feel like committing suicide now, I am about to lose all I have worked for and you expect me to be happy.  I have to tell you that all documents attached to this contract was handed over to the Agent who has submitted them all to the FSA for the purpose of this clearance we are about to pay for.   I will not have any papers or documents linked to this contract until the FSA clearance is perfected.  Failure to get this done is like killing all I have worked for, I do not need the $10,000 because it will not help solve this problem.  I will only be needing just $2900 for some personal issues, You can keep the rest and make sure that you help source for the balance and send it to London before wednesday, its very clear that we have few days before they place a complete embargo on the funds, are you going to watch this happen to me ?

15.)   Later, on the same day (January 30, 2016), "Morgan" e-mailed V.G. and wrote:

I am very unhappy at the moment, I feel like committing suicide now, I am about to lose all I have worked for and you expect me to be happy.  I have to tell you that all documents attached to this contract was handed over to the Agent who has submitted them all to the FSA for the purpose of this clearance we are about to pay for.  I will not have any papers or documents linked to this contract until the FSA clearance is perfected.  Failure to get this done is like killing all I have worked for, I do not need the $10,000 because it will not help solve this problem.  I will only be needing just $2900 for some personal issues, You can keep the rest and make sure that you help source for the balance and send it to London before wednesday, its very clear that we have few days before they place a complete embargo on the funds, are you going to watch this happen to me ?[3]

"Morgan" used the exact language in the "line" provided by the person behind the evanskennedy22@yahoo.com account to try and cause V.G. to send "Morgan" $2,900.00 for his purported "personal issues."

**Identification of Adebodun Idowu and His Company, Santoks Investments L.L.C.**

16.)   On the following day (January 31, 2016), "Morgan" wrote an e-mail to evanskennedy22@yahoo.com that said, ".Hello sir..am waiting for the account for the $2900. $...have a safe trip sir..."  Investigators believe that "Michael Morgan" was waiting for some other member of the conspiracy to provide him with a bank account into which the $2,900.00 sought from V.G. could be wired.

---

[3] Morgan's e-mail concluded with one additional sentence that said "am ready to come to you right now and we need to be happy and have fun together love but please help me get this 20million so I can home...."

8

17.)  On February 1, 2016, "Morgan" e-mailed V.G. with the bank account information into which the $2,900.00 was to be wired.  The bank account was a Bank of America account (#xxxx xxxx 5086) in the name of Santoks Investments L.L.C.  Despite "Morgan"'s plea for the $2,900.00, V.G. did not send the money as requested, recognizing that she was likely the victim of a scheme to defraud.

18.)  Investigators have learned that on July 26, 2015, Adebodun Idowu created Santoks Investments L.L.C. by filing a Certificate of Formation with the New Jersey Department of the Treasury, Division of Revenue and Enterprise Services.  According to the Certificate of Formation, Santoks Investments L.L.C. is a Domestic Limited Liability Company with a Main Business Address of 47 Brenner Street, Newark, New Jersey 07108 and that the business' purpose is "GENERAL MERCHANDISE".

**Adebodun Idowu's Likely Connection to the Person Behind E-Mail Account evanskennedy22@yahoo.com**

19.)  On or about July 16, 2016, Adebodun Idowu entered into the United States through the JFK, New York port of entry.  The electronics possessed by Idowu during this entry into the United States were searched pursuant to the United States' border search authority.  The border search revealed that Idowu used the messaging application WhatsApp on his Apple iPhone 6s to communicate with others.  In one of Idowu's now since deleted messages dated September 5, 2014, he either wrote, or received from someone else, a message that contained the e-mail address "evanskennedy22@yahoo.com".  While investigators are not entirely sure of the extent of the relationship between Idowu

and the person behind the e-mail account evanskennedy22@yahoo.com, it is clear that some type of relationship does exist and that the person behind evanskennedy22@yahoo.com is involved in the fraud scheme(s) being investigated.[4]

### Bank Accounts Owned and Controlled by Santoks Investments L.L.C. and Adebodun Idowu

20.)  Investigators have obtained bank account records associated with Bank of America account (#xxxx xxxx 5086)—the account into which "Michael Morgan" wanted V.G. to wire $2,900.00.  The account is owned by Santoks Investments L.L.C. and was opened on January 12, 2016 by Adebodun Idowu acting as a "member" of the company.  In connection with this account opening, Idowu proved his identify to the bank by providing a copy of his Maryland driver's license with number I-300-031-031-972.

21.)  In addition to Santoks Investments L.L.C.'s Bank of America account (#xxxx xxxx 5086), the company has the following other bank accounts which have been opened between December 2015 and the present by Adebodun Idowu:

> a.) Bank of America account # xxxx xxxx 2173;
> b.) Bank of American account # xxxx xxxx 1783;
> c.) J.P. Morgan Chase account # xxx xxx 138;
> d.) J.P. Morgan Chase account # xxx xxx 2207;

---

[4] Other items recovered from Idowu's electronic items suggest that he has some type of business that sells used automobiles in Nigeria.  I know from my training and experience that the export of used automobiles from the United States for sale in Nigeria can be a legitimate business, but it can also be used as a front for other criminal activity, to include the laundering of money derived from criminal activities conducted inside of the United States.

e.) Branch Banking and Trust Company account # xxxx xxxx 72300;

f.) PNC Bank account # xxx xxx 5342;

g.) Wells Fargo account # xxx xxx 6484; and

h.) Wells Fargo account # xxx xxx 3780.

22.) Between January 1, 2015 and August 30, 2016, the Santoks Investments L.L.C. bank accounts referenced in paragraph #21 (including Bank of America account xxxx xxxx 5086) have had approximately $296,570.35 cumulatively deposited into the accounts via wires, cash deposits, or incoming transfers from other purportedly unrelated accounts.

23.) An analysis of these same accounts shows evidence of structured cash withdrawals designed to stay at or below the $10,000.00 threshold for the filing of a Currency Transaction Report (CTR).[5]  Some examples are below:

a.) On February 19, 2016, Adebodun Idowu made the following cash withdrawals (via bank teller(s)) from Bank of America account # xxxx xxxx 5086:

$7,500.00
$4,000.00

b.) On April 25, 2016, Adebodun Idowu made the following cash withdrawals (via bank ATM(s)) from J.P. Morgan Chase account # xxx xxx 138:

$3,000.00
$800.00
$200.00
$800.00
$200.00

---

[5] CTRs are forms that U.S. financial institutions are required to file with the Financial Crimes Enforcement Network (FinCEN) for each deposit or withdrawal of currency (cash) into or from the financial institution that exceed $10,000.00.  I know from my training and experience that individuals engaged in fraudulent financial schemes often endeavor to keep their cash deposits and withdrawals below the CTR filing threshold in an effort to avoid detection by law enforcement.

$3,000.00
$800.00
$200.00
$1,500.00
$1,500.00
$800.00
$200.00

c.)   On May 23, 2016, Adebodun Idowu made the following cash withdrawals (via bank teller(s) and ATM(s)) from Bank of America account # xxxx xxxx 2173:

$10,000.00
$10,000.00
$700.00
$700.00
$300.00

d.)   On May 23, 2016, (the same day as in subparagraph (c) above), Adebodun Idowu made the following cash withdrawals (via bank ATM(s) and possibly via teller) from J.P. Morgan Chase account # xxx xxx 138:

$3,000.00
$800.00
$200.00
$800.00
$200.00
$3,000.00
$800.00
$200.00
$10,000.00

e.)   On June 10, 2016, Adebodun Idowu made the following cash withdrawals (via bank ATM(s) and possibly via teller) from J.P. Morgan Chase account # xxx xxx 138:

$3,000.00
$800.00
$200.00
$8,000.00

**Adebodun Idowu Appears to Have Adopted the Identity of Purported Nigerian National "Dino Ola Martins"**

24.)    On March 6, 2017, investigators in New Jersey conducted physical surveillance of Adebodun Idowu's 518 Great Beds Court, Perth Amboy, New Jersey residence.  At approximately 10:25 a.m., Idowu was observed leaving the residence and getting into a black Nissan Altima.  At around 11:45 a.m., Idowu was observed parking the Nissan Altima near 6 South Davenport Street, Somerville, New Jersey and entering a J.P. Morgan Chase bank. After Idowu departed the bank, investigators spoke with bank branch personnel who said that Idowu claimed to be "Dino Ola Martins" and that he had attempted to open a bank account.  In an effort to prove his purported identity, Idowu, a/k/a Dino Ola Martins, provided J.P. Morgan Chase employees with (i) a Nigerian passport (#A05106785 and expiration date June 12, 2021) in the name of Dino Ola Martins; and (ii) Bank of America bank statements for Bank of America account xxxx xxxx 0812 in the name of "Dino O Martins" with a bank statement mailing address of 9 E 8TH Street, Apt 101, New York, NY 10003-5901.  Bank personnel copied both the passport and bank statements and provided copies to investigators.

25.)    The aforementioned event was significant for a couple of reasons. First, investigators now suspected that Idowu was likely using the identity of Dino Ola Martins to open up bank accounts that were likely being used in the schemes under investigation.  Second, during the July 16, 2016 border search of Idowu's electronics, investigators discovered pictures (on Idowu's iPhone) of

two identification documents with Idowu's picture (the same picture on the
Nigerian passport in the name of Dino Ola Martins), but with different names:

    a.)    Idowu's picture was on a Maryland driver's license (with # S-515-256-619-578 and expiration date July 16, 2021) in the name of "Biodun Akosile"; and

    b.)    Idowu's picture was on a Maryland driver's license (with # S-515-779-619-976 and expiration date July 16, 2021) in the name of "William Baume."

26.)    On April 29, 2017, Adebodun Idowu again entered into the United
States, but this time through the Atlanta International Airport Port of Entry.
The electronics possessed by Idowu during this entry into the United States
were searched pursuant to the United States' border search authority.  The
border search revealed that Idowu's MacBook Pro laptop computer contained a
picture of someone holding the Nigerian passport of Dino Ola Martins with
passport # A05106785 and Idowu's picture.  The picture of the passport
appeared to be the same passport that Idowu provided to J.P. Morgan Chase
bank personnel on March 6, 2017 (*see* paragraph # 24).

### Identification of the Photograph of Adebodun Idowu Used in the Various Counterfeit Identification Documents Noted in the Investigation

27.)    Investigators with the United States Department of State,
Diplomatic Security Service (DSS) located Adebodun Idowu's online United
States visa application in which he sought admission to the United States as a
Visitor for Business and Pleasure (B1/B2).  Idowu's photograph that he
submitted in connection with his visa application appears to be the same
photograph appearing on his Nigerian passport in the name of Dino Ola

Martins, his Maryland driver's license in the name of "Biodun Akosile," and his Maryland driver's license in the name of "William Baume."  Thus, investigators suspect that Idowu is making false or counterfeit identification documents, or is working with someone who is making the false or counterfeit identification documents for him.

### Adebodun Idowu, Posing as Dino Ola Martins, Opens Bank Accounts and Creates a Company Called Dimax Investments L.L.C.

28.)   Investigators have learned that on that on February 27, 2017, a person named "Dino Ola Martins" (believed to be Adebodun Idowu) created Dimax Investments L.L.C. by filing a Certificate of Formation with the New Jersey Department of the Treasury, Division of Revenue and Enterprise Services.  According to the Certificate of Formation, Dimax Investments L.L.C. is a Domestic Limited Liability Company with a Main Business Address of 1056 Highway 9 South #132, Parlin, New Jersey 08859, and that the business's purpose is "BUYING AND SELLING OF GENERAL MERCHANDISE".  The address of 1056 Highway 9 South in Parlin, New Jersey is a UPS Store.[6]

29.)   Based upon a review of various bank records, investigators have determined that Dino Ola Martins and/or Dimax Investments L.L.C. have opened the following bank accounts in 2017:

    a.)   Bank of America account # xxxx xxxx 0812 in the name of Dino Ola Martins;

---

[6] Postal Inspectors have obtained the account records for post office box #132 at the UPS Store located at 1056 Highway 9 South, Parlin, New Jersey.  The records show that the box was opened by Dino Ola Martins on February 20, 2017, and that Dino Ola Martins 'proved' his identity by providing the same counterfeit Nigerian passport for Dino Ola Martins (# A05106785) that Idowu has used to open bank accounts in the name of Dino Ola Martins and Dimax Investments L.L.C.

b.)    Bank of America account # xxxx xxxx 1713 in the name of Dino Ola Martins;

c.)    Bank of America account # xxxx xxxx 5704 in the name of Dimax Investments L.L.C.;

d.)    Bank of America account # xxxx xxxx 5717 in the name of Dimax Investments L.L.C.; and

e.)    Wells Fargo account # xxx xxx 6855 in the name of Dimax Investments L.L.C.

For the two Dino Ola Martins personal bank accounts, Dino Ola Martins 'proved' his identity by providing the Nigerian passport in the name of Dino Ola Martins (passport # A05106785 and expiration date June 12, 2021). In each of the two Dimax Investments L.L.C. Bank of America bank accounts, Dino Ola Martins opened each account as the company's "Manager" and 'proved' his identity by providing the Nigerian passport in the name of Dino Ola Martins (passport # A05106785 and expiration date June 12, 2021). In the Wells Fargo account application for Dimax Investments L.L.C.'s account # xxx xxx 6855, Dino Ola Martins opened the account as "sole owner" of the company and 'proved' his identity by providing the Nigerian passport in the name of Dino Ola Martins (passport # A05106785 and expiration date June 12, 2021). Additionally, in the same Wells Fargo account application, Martins (Idowu) described Dimax Investments L.L.C.'s business as "buying and selling of general merchandise auto" with annual gross sales of "$100,000.00."

30.)    Investigators have obtained Bank of America surveillance video from March 6, 2017 from the bank's Manville Main New Jersey branch. On this date, Idowu, posing as Dino Ola Martins, either signed, or updated his signature card, for the two Dino Ola Martins Bank of America accounts (# xxxx xxxx 0812 and # xxxx xxxx 1713), and the Dimax Investments L.L.C. Bank of

16

America account xxxx xxxx 5704.  During the March 6, 2017 surveillance video, Idowu can be clearly seen entering the bank, spending approximately 2.5 hours inside of the bank, and interacting with Bank of America employee J.P.

31.)   On August 15, 2017, Bank of America employee J.P. was interviewed by investigators.  J.P. stated that on March 6, 2017 he/she did work with what he/she believed to be Bank of America customer Dino Ola Martins and his company Dimax Investments L.L.C.   J.P. also stated that Dino Ola Martins 'proved' his identity by providing him/her with a Nigerian passport in the name of Dino Ola Martins (passport # A05106785 and expiration date June 12, 2021).

32.)   In connection with the Bank of America account opening documents for account # xxxx xxxx 0812, Idowu, posing as Dino Ola Martins, gave a current mailing address of 9 E 8th Street, Apartment 101, New York, NY 10003.  A review of recent monthly account statements for Dino Ola Martins (and some Dimax Investments L.L.C.'s statements) show a mailing address of 9 E 8th Street, Apartment 101, New York, NY 10003.  Investigators have since determined that this address is not the address of an actual apartment, but is the address of a private post office box at a UPS Store located at 9 E 8th Street, New York, NY 10003.

**Adebodun Idowu is Continuing to Structure Withdrawals of Cash From His Bank Accounts in the Names of Dino Ola Martins and Dimax Investments L.L.C.**

33.)   Between January 1, 2017 and July 1, 2017, the bank accounts owned / controlled by Dino Ola Martins and Dimax Investments L.L.C. (bank

accounts referenced in paragraph #29) have had approximately $381,597.95 cumulatively deposited into the accounts by either wires, cash deposits, or incoming transfers from purportedly unrelated other accounts.

34.)   An analysis of these same accounts shows evidence of structured cash withdrawals designed to stay at or below the $10,000.00 threshold for the filing of a Currency Transaction Report (CTR).   Some examples are below:

a.)   On February 27, 2017, Dino Ola Martins made the following cash withdrawals (via bank teller(s) and bank ATM(s)) from Bank of America account # xxxx xxxx 0812:

$10,000.00
$800.00
$200.00

b.)   On March 3, 2017, Dino Ola Martins made the following cash withdrawals (via bank teller(s) and bank ATM(s)) from Bank of America account # xxxx xxxx 0812:

$2,000.00
$8,000.00
$800.00
$200.00

c.)   On May 16, 2017, the following cash withdrawals (via bank teller(s) and bank ATM(s)) were made from Dimax Investments L.L.C's Bank of America account # xxxx xxxx 5704:

$10,000.00
$3,320.00
$700.00
$500.00
$500.00

d.)   On May 22, 2017, the following cash withdrawals (via bank teller(s) and bank ATM(s)) were made from Dimax Investments L.L.C's Bank of America account # xxxx xxxx 5704:

18

$10,000.00
$700.00
$500.00
$500.00

e.)   On June 7, 2017, the following cash withdrawals (via bank teller(s) and bank ATM(s)) were made from Dimax Investments L.L.C's Bank of America account # xxxx xxxx 5704:

$8,000.00
$10,000.00
$700.00

**Interview of Victim J.S.#2**

35.)   Investigators have recently reviewed the June 2017 monthly account statement for Dimax Investments L.L.C.'s Bank of America account # xxxx xxxx 5704.  The statement shows that on June 5, 2017, J.S.#2 wired $200,000.00 into the account.

36.)   On July 31, 2017, agents with Homeland Security Investigations (HSI) telephonically interviewed J.S.#2.  J.S.#2 is an elderly man (81 years of age) who lives in Lucerne, California.  During the interview, J.S.#2 said a variety of things, including:

a.)   that in May, 2017 he was contacted by a purported representative of Chong Hing Bank in Hong Kong, China who said that he (J.S.#2) was the beneficiary of a large cash estate that was purportedly being held at the bank;

b.)   that the bank representative said that if J.S.#2 was too elderly to travel to Hong Kong to claim the purported funds, that he (J.S.#2) should work with "Paul Tsu" with Yuen & Tsu Solicitors in Hong Kong to claim the funds in the estate;

19

c.)   that Paul Tsu told him that there were approximately $293,000.00 in back taxes associated with the cash estate, and that the taxes had to be paid before J.S.#2 could receive his money;

d.)   that he (J.S.#2) agreed to pay the 'back taxes' and was told by Paul Tsu to wire the money to Dimax Investments L.L.C.'s account with Bank of America;

e.)   that he (J.S.#2) didn't have the full $293,000.00 in one account, so he wired $200,000.00 from one account, and $93,000.00 from a different account, and that after wiring the funds, he was told that an additional $200,000.00 would have to be paid before the purported cash estate could be released; and

f.)   that he was going to tell Paul Tsu that he had no more money to send.

To date, J.S.#2 has not received any cash from the purported cash estate of which he is the beneficiary.

### Adebodun Idowu, Posing as Dino Ola Martins, Launders J.S.#2's $200,000.00 Wire Through Dimax Investments L.L.C.'s Bank of America Account # xxxx xxxx 5704

37.)   As described above, account records for Dimax Investments L.L.C.'s Bank of America account # xxxx xxxx 5704 show that on June 5, 2017, J.S.#2 wired $200,000.00 into the account.  Within three days of receiving J.S.#2's $200,000.00 wire, Dino Ola Martins (Idowu) withdrew, transferred, and wired out $194,050.00 of J.S.#2's money.  Below are the pertinent debit transactions:

a.)   June 5, 2017: $20,000.00 cash withdrawal;
b.)   June 6, 2017: $9,000.00 cash withdrawal;

      c.)     June 6, 2017: $3,800.00 transfer to Bank of America account ending #4734;

      d.)     June 6, 2017: $80,000.00 wire to Santoks Investments L.L.C.'s Branch Banking and Trust Company account # xxxx xxxx 72300;

      e.)     June 6, 2017: $11,750.00 wire to Emmanuel Olugbake's TD Bank account ending #6016;

      f.)     June 6, 2017: $14,000.00 cash withdrawal;

      g.)     June 7, 2017: $8,000.00 cash withdrawal;

      h.)     June 7, 2017: $25,000.00 wire to Dimax Investments L.L.C.'s Santander Bank account ending 1252;[7]

      i.)     June 7, 2017: $10,000.00 cash withdrawal;

      j.)     June 8, 2017: $10,000.00 cash withdrawal; and

      k.)     June 8, 2017: $2,500.00 transfer to Bank of America account ending #9310.

I know from my training and experience that perpetrators of financial frauds, in an effort to make it more difficult for law enforcement to recover stolen funds, often move the stolen funds from one account to another and commingle the stolen funds with legitimate funds.

### Execution of a Search Warrant at Adebodun Idowu's Residence in Perth Amboy, New Jersey

38.)   On the morning of September 26, 2017, investigators executed a federal search warrant at Adebodun Idowu's 518 Great Beds Ct. Perth Amboy, New Jersey residence / premises.  Investigators were authorized to search for, and seize, evidence of a variety of offenses, including evidence of violations of Title 18, United States Code, Sections 1343 & 1349 (Conspiracy to Commit Wire Fraud).

---

[7] Investigators first learned about this account after reviewing the monthly account statement for Bank of America account # xxxx xxxx 5704.

39.)  As a result of the aforementioned search, investigators seized a

variety of items, including:

        a.)  Idowu's wallet which contained a Bank of America debit card in the name of Dimax Investments / Dino Martins;

        b.)  An envelope containing a New Jersey driver's license in the name of Dino Martins;

        c.)  A Nigerian national driver's license in the name of Dino Martins which contained a picture of Adebodun Idowu;

        d.)  A residential lease for 47 Brenner Street, Newark, NJ in the name of "Martin Ola Dino";

        e.)  A Certificate of Formation for Dimax Investments L.L.C. with registered agent of Dino Ola Martins;

        f.)  Documents from Chase Bank in the name of Dimax Investments;

        g.)  Mail in the name of Santoks Investments; and

        h.)  A Nigerian passport in the name of Dino Ola Martins which contained a picture of Adebodun Idowu.

40.)  In connection with the aforementioned search, investigators sought

to interview Idowu.  Idowu agreed to an interview and underwent a non-

custodial interview.  During this interview, Idowu said a variety of things,

including:

        a.)  That he was Adebodun Idowu;

        b.)  That he was the sole employee of Santoks Investments;

        c.)  That Santoks Investments is involved in the export of vehicles to Africa;

        d.)  That he had exported seven cars so far this year;

        e.)  That he did not know who J.S. #2 was;

        f.)  That he did not know who Dino Ola Martins was;

        g.)  That he was familiar with Dimax Investments and that there was some type of business relationship between he and Dimax;

        h.)  That he was familiar with the CTR filing requirements; and

        i.)  When shown Bank of America bank surveillance screen captures taken on March 6, 2017, that he was the person shown in the screen captures.